**UNION PETROLEUM CORPORATION**

v.

**The UNITED STATES.**

**No. 144–76.**

United States Court of Claims.

June 3, 1981.

Robert C. Gerrard, Boston, Mass., attorney of record, for plaintiff.

Carolyn Thayer Ross and Bowker, Elmes, Perkins, Mecsas & Gerrard, Boston, Mass., of counsel.

Nancy J. Marvel, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant.

Anthony C. Liotta and Erica L. Dolgin, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and NICHOLS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Louis Spector, filed September 4, 1980, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the recommended decision as the basis for its judgment in this case. Accordingly, judgment is entered for plaintiff for $99,952.17 and defendant's counterclaim is dismissed.

## OPINION OF TRIAL JUDGE

SPECTOR, *Trial Judge*: During a labor strike at plaintiff's oil terminal in Revere, Massachusetts, unknown vandals opened valves on two railroad tank cars which had previously been filled at plaintiff's facility, resulting in the discharge of about 60,000 gallons of No. 6 fuel oil. Part of the oil reached Chelsea Creek, a navigable waterway of the United States. Plaintiff notified the United States Coast Guard of the discharge as required by the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376 (1976) (hereinafter "FWPCA" or "the Act"), and immediately commenced cleanup operations. This action is brought under the FWPCA to recover expenses incurred by plaintiff in cleaning up the discharge, agreed by the parties to be $99,952.17. Defendant counterclaims for its expenses incurred in cleaning up the discharge, agreed to be $34,862.55.

■ After consideration of the facts and arguments ably presented by both sides at trial and in the briefs, it is herein concluded that plaintiff has established all of the elements required by the Act to recover its reasonable expenses, and that judgment should be entered for plaintiff. Defendant's counterclaim should accordingly be dismissed.

## I. FACTS

### A. Basic Layout of the Union Oil Terminal

The Union Petroleum Corporation operates an oil terminal and distribution facility on roughly 5 acres of land along Lee Burbank Highway in Revere, Massachusetts. It includes a tank farm for the storage of gasoline and oil, loading racks for trucks and railroad tank cars, and a dock extending into Chelsea Creek at which oil tankers moor. The tank farm is located on the south side of Lee Burbank Highway and is not relevant to this case. The gasoline and oil loading racks for trucks, the ship docks, the railroad tank car loading racks, office buildings, warehouse, control shack and guard shack are on the north side of Lee Burbank Highway (hereinafter the "Union yard" or the "yard").

A railroad spur runs into Union's yard just inside its northern perimeter. Union's facility contains a loading rack over this railroad spur line for the loading of railroad tank cars, which is part of the terminal operation. The part of Union's property containing the loading racks for railroad tank cars is separated from Chelsea Creek by a narrow strip of property owned by the Boston & Maine Railroad (hereinafter "B&M"). There is a railroad spur on the B&M property parallel to the spur on Union property and only a few feet away. The railroad picks up and delivers tank cars from the Union loading rack by switching between its spur and Union's. In 1975 this spur was used exclusively for Union tank cars.

The Union yard is surrounded by a chain link fence, containing five gates. One of these gates, on the north side of the yard (Gate 1), is about 8 feet wide. Railroad tank cars enter Union's yard through this gate. The others, on the south side (that is, the Lee Burbank Highway side) of the yard,

---

\* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

are about 20 feet wide. There is no fence behind a building known as the Airborne Freight warehouse (not owned by Union) on the north perimeter of the Union yard. Nor is there a fence for approximately 75 feet beyond the west end of the warehouse. However, in place of a fence there is a large pipeline. There was testimony that a person could crawl under the pipeline system, but that "it would be very difficult." The narrow strip of land owned by the B&M Railroad between the Union yard and Chelsea Creek is not surrounded by fence.

Because the terminal is designed to operate on a 24-hour basis, the Union yard is also well equipped with external lighting. There are 1000-watt mercury street lights extending over each of the tank cars at the tank car loading rack. Behind the Airborne Freight warehouse, also along the north perimeter of the yard, there are lights of 200–400 watts each. The office building and gasoline racks in the interior of the yard are also well lighted. Finally, there are lights at Gate 3 on Lee Burbank Highway.

Union's terminal employs an "oil separator," which is a pollution control device intended to prevent oil from being discharged into the creek. The drain leading to this separator is located under the railroad tank car loading rack. Rainwater and oil flow through catch basins into the separator where the oil is separated from the water. The water then flows into Chelsea Creek and the oil stays on top of the separator where it is periodically pumped out. The separator is designed to shut off automatically if it is overloaded. It may also be shut off manually.

The Union yard also has a spill containment system in the area of the loading rack. The land on the loading rack side of the railroad tracks is significantly lower than the tracks, and also lower than the land on the Chelsea Creek side of the tracks. The lowest area is behind the Airborne Freight warehouse on the north perimeter of the yard. This low-lying area serves as a containment pocket. In addition, there is very little slope from the railroad tracks toward Chelsea Creek. Chief Williams of the U. S. Coast Guard testified that because of this containment basin, the oil from this spill would not have reached Chelsea Creek but for previously unknown "ancient" wooden culverts under the tracks, owned by the B&M Railroad.

In 1975 and prior thereto, the U. S. Coast Guard regularly inspected Union's onshore facility, dock area and the pipeline area that leads to the dock, on a quarterly basis. Coast Guard inspections were for the purpose of determining the adequacy of containment systems of oil tank farms to check whether oil spills would flow into navigable waters, and to examine lighting and safety requirements and containment systems under pipelines. If violations had been found, the Coast Guard would have issued a notice of violation. No such notices are offered or contained in the record.

The record indicates that Union was charged with discharging oil into navigable waters of the United States on only one occasion prior to 1975. On December 21, 1972, a leak in an oil tank truck on Union's property discharged a small quantity of oil into Chelsea Creek. A civil penalty of $500 was assessed against Union for that minor discharge.

The Environmental Protection Agency, which was responsible for Union's Spill Protection Plan, also inspected Union's premises. At no time prior to April 1975, did that agency make any recommendations to Union with respect to its containment facilities.

In addition, the Commonwealth of Massachusetts, which was responsible for issuing the necessary marine oil terminal license, inspected Union's premises. Union's marine oil terminal license has never been withheld for environmental or any other reasons.

Frederick L. Forest, plaintiff's operations manager, testified that at no time during his employment at Union from 1964 to 1975 had he ever heard of any vandalism or witnessed any vandalism of tanks or tank cars resulting in a spillage of oil. He also testified that he was aware of no similar

occurrences at any other oil concerns or tank farms. Lt. Commander Donald Tilton of the U. S. Coast Guard testified to the same effect.

### B. Standard Railroad Tank Car Loading Procedures

Railroad tank cars are typically brought under the Union loading racks in groups of three. Once they are in place under the racks, a Union employee checks the valve on the bottom of each car, and attaches a numbered seal to the valve handle. Because of the design of the tank cars, no locks are placed on these handles. The general practice in the oil industry is to place seals on tank cars to indicate whether they have been tampered with. It would take a pair of pliers to break the seal which is installed through a ¼ inch orifice. Breaking of a lock (if one were installed) would be a simple matter for a determined vandal. The Department of Transportation does not require locks. The Union employee then opens the cover on top of the tank car and inserts the loading tube, and after opening a valve on the loading arm, he proceeds to load the tank car. The spur on Union's property is not long enough to accommodate an entire train of tank cars. Therefore, after the three cars are filled in this manner and the dome covers replaced, Union calls upon the B&M Railroad to move the three cars to the parallel B&M spur just off Union's property. This process is repeated until nine cars have been filled, at which time all nine cars are linked up for one train and moved to a power plant where the oil is consumed.

### C. Security Measures Taken by Union in Response to the Labor Strike

On April 3, 1975, a labor union steward notified plaintiff's operations manager, Mr. Forest, that the union would go on strike at 4:00 p.m. that day. He immediately put Union's preestablished contingency plans into effect. Mr. Forest first called the Revere Police Department and requested two officers on a 24-hour basis. At least two Revere police officers were continually on duty at the Union yard beginning at approximately 8:00 p.m. on April 3, 1975.[1] There had been no violence associated with the strike.

On the morning of April 4, 1975, Mr. Forest telephoned Hallmark Security, the private security agency employed by Union for 3 to 4 years prior to the strike. He testified that in his conversation with Mr. Prew, President of Hallmark Security, he requested that a security guard be stationed in the gasoline yard. The guard would be expected to watch the gasoline loading rack, walk the perimeter of the yard, past Gates 4 and 5 along the west side of the premises, and check in back of the Airborne Freight warehouse and in the area of the railroad tank cars at the extreme northern end of the yard.[2]

Also on April 3, 1975, Mr. Forest informed a Mr. Mark Hoyt at Airborne Freight of the strike, and asked him to leave all the lights on in back of the warehouse. Mr. Forest testified that he observed that these lights were in fact on for the duration of the strike.

---

1. The testimony is in sharp conflict as to whether the police were instructed to patrol the Union yard, and further as to whether they did in fact patrol, either on foot or in their patrol cars. See, e. g., Tr. 75, 392. It seems highly unlikely that Union would request extra police protection, and then instruct the police to ignore plaintiff's facility except for the gate area on Lee Burbank Highway. Even in this unlikely event, plaintiff's efforts to secure extra protection from police and from its private security company are sufficient to meet the "reasonableness" standard required here, especially since plaintiff had no reason to anticipate the sort of senseless vandalism which subsequently occurred.

2. The record contains conflicting testimony as to what instructions were communicated to the Hallmark Security guards, and as to whether they did in fact patrol the areas identified by Mr. Forest. See, e. g., Tr. 77–78, 208, 216, 348–52. A security guard's normal job was to stay in the guard station inside the yard, logging in all vehicles entering and leaving the yard, and to check the area for fires, spills, and burglars. It is possible that Mr. Forest's special instructions for the strike were not communicated to the security guards before they reported for duty. It is also possible that cold temperatures during the night kept the guards close to the guard station despite their instructions.

One of the security guards employed by Hallmark, a Richard Delaney, testified that the lights over the tank car loading racks were on during the first night of the strike, but were not on during the night of the spill.[3] Mr. Forest testified, however, that these lights "were on day and night" throughout the strike, beginning at 4:00 p. m. on the first day. Mr. Forest's testimony was corroborated by that of Mr. Johnson, a Union salesman on special duty the night of the spill. He testified that on the night of the spill "the racks and the complete area was lighted."

Finally, at least two Union employees were stationed in the control shack in the yard during the strike. Although some parts of the yard, including Gate 1, could not be seen from the control shack, the tank car loading racks were visible.

### D. Oil Discharge, April 6, 1975

The labor strike continued into the night of April 5–6, 1975. Teamsters Union pickets stood in front of Union's property on Lee Burbank Highway during the night. Union remained open on a 24-hour basis.

On Sunday, April 6, 1975, sometime between midnight and 8:00 a. m., oil was discharged from two railroad tank cars, part of which reached Chelsea Creek. The tank cars were owned by the Union Tanker Corp. and leased to H. N. Hartwell & Sons (hereinafter "Hartwell"). Hartwell was also owner of the oil discharged from the tank cars.

The two tank cars were among six brought to Union's loading rack by employees of the B&M Railroad on April 5, 1975. Each was filled with approximately 30,000 gallons of No. 6 fuel oil by a Mr. E. J. DeRose, a Union employee. After the cars had been filled and the covers replaced according to standard Union procedures, three of the cars were moved at Union's direction by railroad employees to the B&M spur adjacent to the loading rack on land owned by the B&M Railroad. The other three remained under the loading racks. Had the

spill not occurred on Sunday, B&M Railroad employees would have moved the cars again on Monday, April 7, eventually collecting nine tank cars for transport to a local utility.

The oil was discharged from the tank cars by unknown parties, as an act of criminal vandalism. Union surmises on the basis of footprints found in the oil on the ground after the discharge, that the vandals entered and left Union's property through Gate 1 at the northern end of the Union yard.

The discharge was discovered by Mr. Forest at about 8:15 a. m. on Sunday, April 6, 1975, when he first arrived at Union's terminal for the day. At the time he arrived, the oil on the ground was the consistency of tar and was several inches deep in some places on Union's property.

### E. Union's Efforts to Clean Up the Spill

Immediately after discovering the spill, Mr. Forest contacted the U. S. Coast Guard, the cleanup contractor Coastal Services, Inc., the Commonwealth of Massachusetts, the Revere Police Department and the Revere Fire Department. He subsequently contacted Mr. Olson of H. N. Hartwell & Sons, Inc., the owner of the oil and lessee of the tank cars. Coastal Services, Inc. is a corporation which specializes in cleaning up oil spills and it worked to clean up this oil spill from April 6, 1975 until May 1, 1975.

At approximately 10:15–10:30 a. m., Chief Frank Williams, a noncommissioned officer of the U. S. Coast Guard, arrived on the scene. Chief Williams served as the supervisor of the cleanup operations for the Coast Guard. By the time he arrived, Coastal Services, Inc. had already begun to clean up the discharge of oil at Union's direction.

The record contains contradictory testimony on the issue of Chief Williams' comments to Union concerning liability for the spill and responsibility for cleanup operations. Mr. Forest testified that upon Chief

---

3. Mr. Delaney had been discharged by Hallmark as a result of a complaint by Union as to his competence. He was an obviously biased and hostile witness, and his testimony, as observed, is entitled to little if any weight.

Williams' arrival at the site, he was asked "if the Coast Guard would pick up the cleanup of the spill at the time and *he told me no, it belonged to us, it looked like it was our fault * * *."*[4] (Emphasis supplied). Mr. Forest further testified that both Chief Williams and a Lt. Littlefield, whom Forest took to be Williams' superior officer, stated that "you own that spill."[5]

Chief Williams testified that at no time did he state "you own that spill." He further testified that Lt. Littlefield did not visit the spill site on April 6, and furthermore that Littlefield was not at that time a member of the Coast Guard. Chief Williams considered his duties at the spill site to be passive and advisory, "to provide any assistance that they [Union] needed [and] to relay any information to the Captain of the port," and to act as "liaison" between Union and the Coast Guard.[6]

Chief Williams' superior officer in the Coast Guard, Lt. Commander Donald Tilton, testified that he did not believe that he (Tilton) had the authority to order Union to continue cleaning up the spill and that he did not attempt to order Union to do so. Nevertheless, he testified that "I probably put it into words such as 'I urge you to continue it.'"[7]

A letter from the Coast Guard to Union dated April 15, 1975, signed by Chief Williams, strongly supports Union's version of the facts, namely, that the Coast Guard considered Union responsible for the spill and for its cleanup. The letter states, in relevant part:

> This is to inform you that a pollution incident has occurred * * * for which you and/or your facility are considered responsible.
>
> *    *    *    *    *    *
>
> * * * [Y]ou are responsible for taking adequate action to remove the pollutant or adequately mitigate its effect.[8]

At a meeting between Union representatives and the Coast Guard on April 15, 1975, also attended by a representative of Hartwell, Mr. Forest stated that Union did not feel the spill was its responsibility, and that the company would like to turn over cleanup operations to the U. S. Coast Guard. Mr. Forest testified that the response from the Coast Guard continued to be the same: "They continued to say that it was ours and we should continue the cleanup."[9]

Union was initially of the opinion that part of the oil had gone through Union's earlier-described oil separator and then into Chelsea Creek. However, the oil continued to reach Chelsea Creek even after the separator had been shut off. On April 13, 1975, Union concluded that the oil was flowing from three "ancient" wooden drainage culverts beneath the B&M tracks into Chelsea Creek. The culverts had at some time in the past been installed by the B&M Railroad and were owned by the railroad. They had been covered with debris and their existence had previously been unknown.

The Coast Guard also concluded that part of the oil from the tank cars reached Chelsea Creek through the culverts. Union first learned of the existence of these wooden culverts on April 13, 1975. Under the direction of the B&M Railroad and on an overtime basis, the entrances to the culverts were blocked with boards and gravel on April 13. But for the culverts, the oil would not have reached Chelsea Creek.

### E. The Coast Guard's Conclusion of Cleanup Operations

On April 21, 1975, Union notified the Coast Guard that it intended to discontinue cleanup operations, and at 12:00 o'clock midnight, April 21, 1975, Union ceased cleanup operations. On April 22, 1975, the Coast Guard sent letters to Union, the B&M Railroad, and H. N. Hartwell & Sons, informing each of them that the Coast Guard

4.  Tr. 99–100.

5.  *Id.*

6.  Tr. 296.

7.  Tr. 281.

8.  P. Ex. 21.

9.  Tr. 141.

was thereafter assuming cleanup responsibilities to remove the pollutants resulting from the pollution incident of April 6, 1975 for which they were considered responsible. The Coast Guard thereafter took over the remaining cleanup operations. Coastal Services, Inc. continued cleanup operations for the Coast Guard until May 1, 1975. The parties agreed that the spill was cleaned up as quickly and efficiently as possible.

### F. Expenses Incurred in Cleanup Operations

Union received five invoices from Coastal Services, Inc. for cleanup operations. Union paid these invoices by checks in the total amount of $99,952.17.

The Coast Guard paid Coastal Services, Inc. $34,610.91 for its services in cleaning up the discharge of oil into Chelsea Creek. The Coast Guard also incurred reimbursable personnel and vehicle expenses of $251.64. The total costs incurred by the Coast Guard in removing the oil discharged into Chelsea Creek were thus $34,862.55.

### G. Coast Guard Findings as to Liability for the Spill

On January 8, 1976, the Coast Guard held an informal hearing to determine whether *Hartwell* should be held liable for a civil penalty pursuant to the FWPCA for the spill of April 6, 1975. The Coast Guard imposed a civil penalty of $2500 and made the following findings:

The discharge was unintentional.

The discharge could not have been prevented using reasonable care.

The discharge was not caused by an act or omission of a type previously attributable, insofar as records available to me, to you so as to place you on notice of the particular hazard.

The discharge was not a violation of the pollution prevention regulations.

The record does not indicate that you took special steps to try to avert the specific discharge in that

* * * [T]he discharge was unforseeable.

* * * [A] minimum amount of oil was discharged.[10]

Moreover, Lt. Commander Tilton testified that he believed that *Union* used reasonable care to prevent the spill, and that it was unforeseeable. He reported his conclusions to his superior officers in the Coast Guard.

### II. Discussion

The basic congressional policy furthered by the FWPCA, as declared in the Act itself, is "that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States."[11] The Act employs several means to accomplish this congressional intent, a number of which are involved in this case. First, the Act makes it a crime for the "person in charge" of a vessel or facility to fail to notify immediately the appropriate federal agency (in this case the U. S. Coast Guard) of a discharge of oil;[12] it authorizes the President to act to remove or arrange for the removal of discharged oil unless he determines that the owner or operator of the vessel or facility from which the discharge occurred will remove it properly;[13] subject to certain monetary limits and defenses, it makes the owner or operator of the facility from which the discharge occurs liable to the United States for actual Government costs incurred in cleanup operations;[14] it makes the owner or operator of the facility from which a discharge occurs strictly liable for a "civil penalty" of up to $5000 (which may be mitigated under certain circumstances);[15] subject to certain defenses and limits, it makes third parties who are solely responsible for a discharge liable to the United States for the actual costs of cleanup operations;[16] and finally, it provides that, subject to limitations here-

10. D.Ex. 14, 21 January 1976.

11. 33 U.S.C. § 1321(b)(1) (1976).

12. *Id.* at § 1321(b)(5).

13. *Id.* at § 1321(b)(1).

14. *Id.* at § 1321(f)(2).

15. *Id.* at § 1321(b)(6).

16. *Id.* at § 1321(g),(h).

inafter detailed, the owner or operator of a facility from which a discharge occurs may bring suit in this court for recovery of its reasonable costs incurred in cleanup operations.[17]

Having fully complied with the notice provisions of the Act immediately upon discovering the spill, and having commenced cleanup operations at its own expense immediately thereafter, plaintiff seeks reimbursement of its cleanup costs pursuant to section 1321(i)(1) of the Act. That section provides:

(i)(1) In any case *where an owner or operator of* a vessel or *an onshore facility* or an offshore facility *from which oil* or a hazardous substance *is discharged* in violation of subsection (b)(3) of this section *acts to remove such oil* or substance *in accordance with regulations* promulgated pursuant to this section, *such owner or operator shall be entitled to recover the reasonable costs incurred in such removal upon establishing*, in a suit which may be brought against the United States Government in the United States Court of Claims, *that such discharge was caused solely by* (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) *an act or omission of a third party* without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes. [Emphasis supplied.]

■ This court has analyzed claims brought pursuant to this section as comprised of four elements:

1. A discharge of a harmful quantity of oil from a facility owned or operated by plaintiff;

2. A discharge caused solely by (*inter alia*) an act or omission of a third party;

3. Removal of the oil in accordance with regulations; and

4. The expenditure by plaintiff of monies to remove the oil.[18]

The third and fourth elements are not here in dispute. Defendant admits that the spill was cleaned up in accordance with federal regulations, and the monies expended on cleanup operations by both parties have been stipulated. The issues are thus reduced to (a) whether the oil discharge occurred from a facility owned or operated by plaintiff; and (b) if so, whether the discharge occurred solely as a result of the acts of third parties. Defendant takes the inconsistent positions that plaintiff acted as a volunteer, because it did not own or operate the facility from which the oil was discharged; and that plaintiff was responsible for the discharge.

### A. Plaintiff's Oil Terminal as the Source of the Oil Discharge

The reimbursement remedy of the Act is available to "an owner or operator of * * * an onshore facility" from which a discharge has occurred.

#### 1. "Onshore Facility"

■ The Act broadly defines an "onshore facility" as:

[A]ny facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land.[19]

There is no doubt that under this definition the Union terminal, consisting in part of a transportation facility which includes loading racks for trucks and railroad tank cars, and a dock extending into Chelsea Creek for oil tankers, is an "onshore facility." It is further undisputed that the spill issued from two tank cars which, as "rolling stock," also meet the statutory definition of an "onshore facility." The tank cars had, on the previous day, been filled by a Union employee at the tank car loading rack as a routine part of Union's oil terminal operation. One of the tank cars was not moved from the loading rack on Union's property

---

17. 33 U.S.C. § 1321(i)(1).

18. *Quarles Petroleum Co. v. United States*, 213 Ct.Cl. 15, 19, 551 F.2d 1201, 1204 (1977), citing

*Yankee Metal Products, Inc. v. United States*, 209 Ct.Cl. 770 (1976).

19. 33 U.S.C. § 1321(a)(10).

prior to the discharge, and the other was moved a few feet away to a parallel spur just beyond Union's yard on land owned by the B&M Railroad. The question is thus whether the relevant "facility" is plaintiff's oil terminal, of which the tank cars were an integral although temporary part, or whether the "facility" is narrowly to be construed as the tank cars alone, which plaintiff did not lease or operate.

The clearly expressed overall policy embodied in the Act, as noted above, is to prevent spills from occurring. A natural corollary of that policy, as already stated by the court, is the "ensuring [of] prompt commencement of cleanup operations"[20] in order to minimize the impact of spills that do occur. To best effectuate these policies, it is concluded for the following reasons that "facility" should be more broadly construed to encompass plaintiff's terminal. To hold otherwise would be to discourage immediate cleanup operations which is the main thrust of the Act.

The court has in this case already expressed doubt "that the tank cars can be properly regarded as a facility wholly segregable from the storage and distribution facility plaintiff operated in Revere."[21] All parties concerned considered Union to be primarily responsible for the tank cars as a part of its oil terminal. Union immediately notified the Coast Guard of the discharge as required by section 1321(b)(5) of the Act. This section provides that notice is to be given by the "person in charge of" the facility. As explained in the legislative history of the Act, the provision was intended to apply to the person "operationally responsible for * * * the facility involved."[22] Union was operationally responsible for the entire tank car loading process, including the movement and location of tank cars in the immediate vicinity of the terminal (even though the actual moving was done by B&M Railroad employees). Union employees filled the tank cars, and called the railroad when cars needed to be moved to or from the loading rack. Although the oil in the tank cars was owned by Hartwell and the tank cars leased to that company, no Hartwell representative was present to safeguard the loading and overnight storage operation. Likewise, the B&M Railroad was called in only temporarily to move the tank cars. It is clear that Union was in charge of the terminal and the tank cars as a part thereof, in the sense of being operationally responsible for them while they were in the process of being loaded and stored for transport. All parties concerned believed this to be the case.[23]

■ The concept of "operational responsibility" also disposes of defendant's contention that at least the tank car parked outside of plaintiff's property was not part of its "facility." Plaintiff controlled the movement and location of the cars along the tracks connected to its oil terminal. Though some tracks were not located directly on plaintiff's property, they were es-

---

**20.** *Union Petroleum Corp. v. United States*, 218 Ct.Cl. 667 (1978).

To draw a parallel, it is not public policy that one first determine the cause of a fire, before attempting to extinguish it. Rather it is sensible to take emergency measures to extinguish a fire, and to reserve an investigation of the cause for later.

**21.** *Union Petroleum*, note 20, *supra*, at 3.

**22.** H.R.Rep.No.91-127, 91st Cong., 2d Sess., *Reprinted in* [1970] U.S.Code Cong. & Ad. News, 2691, 2692.

**23.** That Union was not the "owner" of the tank cars or the oil is not a reason for denying it the benefit of the reimbursement provision. To take an analogy from the law of sales, under the Uniform Commercial Code ownership or "title" of goods does not determine who must bear the risk of loss. UCC § 2-509 attempts to "place the loss upon the one most likely * * * to take precautions to protect against loss," and that means in most cases the one who has *possession* and *control* of the goods. White & Summers, Handbook Of The Uniform Commercial Code (1972) at 138. Likewise in this case it is clearly Union which was responsible in the sense of having possession and control of the tank cars, despite Hartwell's ownership of the oil and lease of the cars. Just as possession and control would determine the responsibility for loss of the oil, so should it determine responsibility for operation of the "facility" involved in the spill. Union did not act as a mere volunteer in promptly initiating cleanup operations. It proceeded as the Act envisioned.

sentially and exclusively employed in connection with the oil terminal operations.

This court has previously questioned the validity of a "hypertechnical approach" to the statutory definitions of the Act that would be "likely to delay cleanup operations while arguing over the responsibility."[24] Had Union at the time of the spill taken a narrow and restrictive view of the definition of the "facility" from which the discharge occurred, a three-way dispute as to who should initiate cleanup operations would have undoubtedly ensued while the oil spill continued and spread. The tank cars were filled by Union employees as part of its oil distribution business; the tank cars and the oil were owned by Hartwell; and finally, one of the tank cars had already been moved by B&M Railroad employees to railroad property. By the time Union had contacted all interested parties (including the U.S. Coast Guard) and the parties had resolved who should initiate cleanup operations, the spill would have become much more serious and widespread. The policies of the Act are far better served if the definition of "facility" is properly construed, thus encouraging an apparently responsible party to begin cleanup operations immediately after discovery of the spill, as Union in fact did in exemplary manner.

The court has also noted that the "Coast Guard at least tacitly approved plaintiff's acting on the assumption that it could be regarded as responsible for cleaning up the oil."[25] Although Chief Williams denied telling Mr. Forest that Union "owned the spill," the Coast Guard letter to Union signed by Chief Williams recites that "a pollution incident has occurred * * * *for which you and/or your facility are considered responsible,"* and further that *"you are responsible for taking adequate action to remove the pollutant * * *."* (Emphasis supplied.)[26] Lt. Commander Tilton, who testified that he did not have the authority

to demand that Union continue cleanup operations, nevertheless encouraged Union by saying something to the effect that "I urge you to continue it." And, at a meeting with Coast Guard officers and representatives from Hartwell at the Union terminal on August 15, 1975, Union was again urged by the Coast Guard to continue. It would be unconscionable for the court to allow the Government now to reverse the position it consistently held during cleanup operations, namely, that Union was the owner/operator of the relevant facility, that it was therefore responsible for cleaning up the spill, and that it did not act as a volunteer.

Finally, Union was encouraged to initiate and continue its cleanup operations because if the Coast Guard took over the cleanup, and it was later determined that Union was in fact responsible, Union would have been liable under the Act for the full amount of the Coast Guard's costs, even if those costs were unreasonable.[27] It would be grossly unfair to require parties to gamble on potential excess liability on the chance that a court might decide, many years after the event, that the relevant "onshore facility" was somewhat different than they and other interested persons assumed in the first chaotic hours following a spill.

### 2. "Owner or Operator"

■ The Act defines "owner or operator" of an onshore facility as "any person owning or operating such an on-shore facility."[28] There is no dispute that Union was both owner and operator of its own oil terminal. Given the above conclusion that the relevant "onshore facility" is Union's terminal and not the individual tank cars, it follows that Union also meets the statutory definition of "owner/operator."

Even if it were narrowly concluded that the tank cars were the "facility" from which the discharge occurred, plaintiff would still, for the purposes of the Act, be

24. *Union Petroleum*, note 20, *supra*, at 3.

25. *Id.* at 4.

26. P. Ex. 21, April 15, 1975.

27. 33 U.S.C. § 1321(f). *United States v. Beatty, Inc.*, 401 F.Supp. 1040 (W.D.Ky.1975).

28. 33 U.S.C. § 1321(a)(6).

the "operator" of the tank cars at the time of the discharge. Loading of the tank cars by Union employees was an integral part of Union's oil distribution system. Overnight storage of the filled tank cars either at the loading rack or on the parallel railroad spur was at Union's direction and control. Union was operationally responsible for the tank cars until they were linked together and sent down the tracks to the utility using the oil. That one of the cars was located just off plaintiff's property is not significant. The question is one of operational control, and Union's control undoubtedly equalled that of either of the other possibly responsible parties.

### B. The Discharge Was Caused Solely by the Act of Third Parties

■ The statute also requires, as a precondition of reimbursement of cleanup expense that the discharge be "caused *solely* by * * * (D) an act or omission of a third party * * *." (Emphasis supplied.)[29] This provision has been construed to require not only that the discharge be the immediate result of the act or omission of a third party, but also that plaintiff must not by act or omission have contributed:

> This court has made it clear that a claimant cannot recover, even if a vandal or third party immediately caused the spillage, if the claimant does not prove that *reasonable actions* had been taken to prevent or forestall such intervention by the third party. [Emphasis supplied.][30]

The parties here agree that unknown vandals committing criminal acts were the immediate cause of the Union spill. The focus thus turns to plaintiff's precautionary measures against vandalism. The standard to be applied is one of "reasonable care."[31] Plaintiff is not an insurer against criminal activity.

This court has previously considered several cases involving very similar circumstances. None, however, involved an open and operational oil terminal. In *Chicago, Milwaukee, supra*, vandals entered plaintiff's lighted property through a gate in the perimeter fence, broke into a locked boiler room, and opened several pipe valves, the handles of which had been removed. The result was the discharge of a large quantity of oil. Noting these facts and also that plaintiff had purchased the premises only 10 days prior to the act of vandalism, the court held that plaintiff had taken sufficient steps to forestall vandalism, and that the spill was therefore due "solely" to the acts of the third party vandals.

Quite different facts were presented by *Proctor Wholesale Co. v. United States*, 215 Ct.Cl. 1049 (1978), where plaintiff's property was not protected by fencing, external lighting or security patrols, and plaintiff had taken "no action" to restrain access by third persons to its oil tanks. The court held that the circumstances were "conducive to vandalism" and denied recovery. Likewise, in *City of Pawtuckett v. United States*, 211 Ct.Cl. 324 (1976), where plaintiff's fencing was incomplete and had "gaping holes," the outdoor lighting was burned out, tank spigots were unprotected and drainage facilities were in disrepair, the spill was concluded not to be caused "solely" by the acts of third party vandals.

The court has suggested that the instant case appears to "fall * * * somewhere between *Proctor* and *Pawtuckett* on the one hand and *Chicago, Milwaukee* on the other."[32] Following a comprehensive trial, and briefing by the parties, it is clear that plaintiff's case is much closer to *Chicago, Milwaukee* than to *Proctor/Pawtuckett*, and that plaintiff's precautions were totally reasonable under the circumstances. The perimeter of plaintiff's property is fully fenced, except for the area behind the Airborne warehouse and for a distance of about 75 feet west of the warehouse, where entry would be obstructed by a large pipeline system equivalent to a fence. There

**29.** *Id.* § 1321(i)(1).

**30.** *Chicago, Milwaukee, St. Paul & Pacific R.R. Co. v. United States*, 216 Ct.Cl. 155, 575 F.2d 839, 841 (1978).

**31.** *Chicago, Milwaukee*, note 30, *supra*.

**32.** *Union Petroleum*, note 20, *supra*.

are six gates in the fence, all of which were open at the time of the discharge, because plaintiff's terminal facility was operational 24 hours per day during the strike. There were 200–400 watt lights along the warehouse, and powerful 1000-watt mercury street lights over the tank car loading rack, which were sufficiently powerful to illuminate not only the tank cars under the loading rack, but also those on the parallel railroad spur. Security was provided by a detachment of two Revere police officers, requested by Mr. Forest at the outset of the strike. There is testimony that the police patrolled the interior of the Union yard in their patrol cars.[33] In addition, a regular security guard was on duty who, according to Mr. Forest, was to patrol the perimeter and "to check in back of the warehouse"[34] in the area of the railroad tank cars. Although the guard testified that he had not patrolled the area, a Union employee testified that he had seen the guard patrolling in the area of the loading rack.[35] Finally, as an emergency response to the labor strike, two Union employees were stationed in the control shack on the night of the spill. They had responsibility for the security of the entire yard.[36]

Finally, the court has no reason to question the adequacy or reliability of plaintiff's oil containment facilities should a mishap nevertheless occur. Plaintiff's yard is equipped with an oil separator that was apparently functioning properly at the time of the spill. The railroad track on which the vandalized cars were resting is higher than the land within the yard, thus providing a dike between the yard and Chelsea Creek. Chief Williams of the U.S. Coast Guard testified that were it not for the hidden and unknown "ancient" culverts under the railroad tracks, oil from the spill would not have reached the creek.[37] Despite frequent inspections neither the U.S. Coast Guard nor the Environmental Protection Agency, nor the Commonwealth of Massachusetts, has ever questioned the adequacy of plaintiff's containment system.[38]

Finally, Lt. Commander Tilton testified that in his opinion Union had used reasonable care to prevent the spill[39] and that the spill was unforeseeable.[40] These conclusions were also embodied in the Coast Guard hearing which resulted in imposition of a civil penalty against *Hartwell* in January 1976.

In light of plaintiff's normal security and spill containment measures, the increased security measures undertaken as a result of the labor strike, the Coast Guard's conclusions as to the reasonableness of plaintiff's precautions, and the unforeseeability of this type of vandalism, it is concluded that plaintiff exercised "reasonable care" as required by the Act and by the decisions of this court.

Having established that plaintiff is the owner or operator of the onshore facility from which an oil discharge has occurred, and that the discharge was solely the result of the act of unknown third parties, plaintiff is entitled to reimbursement of its stipulated cleanup costs of $99,952.17. Defendant's counterclaim for its cleanup cost must, for the same reasons, be dismissed.

## CONCLUSION OF LAW

Upon the findings and the foregoing opinion, which are adopted by the court, the

---

**33.** Tr. 208.

**34.** Tr. 78, 409.

**35.** Tr. 208, 216.

**36.** Tr. 80–81, 203.

**37.** Tr. 300.

**38.** Defendant relies on and cites federal guidelines for oil spill containment capacities. 40 C.F.R. § 112.7(e)(4)(ii) to argue that plaintiff's containment system was inadequate and therefore contributed to the spill. Judging by Union's virtually spotless record, the federal and state agencies charged with administering these and other oil spill prevention regulations apparently found the facilities adequate. Defendant has not urged that plaintiff was negligent for failing to discover the hidden culverts earlier than it did.

**39.** Tr. 279.

**40.** Tr. 254.

court concludes as a matter of law that plaintiff is entitled to reimbursement of its stipulated cleanup costs of ninety-nine thousand, nine hundred fifty-two dollars and seventeen cents ($99,952.17), and judgment is entered in that amount; and that defendant is not entitled to recover on its counterclaim and that it be and the same is hereby dismissed.