TRAVELERS INSURANCE CO.

v.

The UNITED STATES.

No. 505–81L.

United States Claims Court.

June 27, 1983.

Timothy J. Battle, Washington, D.C., for plaintiff; Carr, Jordan, Coyne & Savits, Washington, D.C., of counsel.

Diane L. Donley, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

SPECTOR, Senior Judge.

Plaintiff insurance carrier is subrogated to the claim of its insured, Nordstrom Oil Company, the owner and operator of an oil tank facility at Onancock, Virginia. The claim arises out of section 1321(i)(1) of the Federal Water Pollution Control Act[1] which provides in pertinent part that:

> In any case *where an owner* or operator *of* a vessel or *an onshore facility* or an offshore facility *from which oil* or a hazardous substance *is discharged* in viola-

---

1. 33 U.S.C. §§ 1251–1376 (1976).

tion of subsection (b)(3) of this section *acts to remove such oil* or substance in accordance with regulations promulgated pursuant to this section, *such owner or operator shall be entitled to recover the reasonable costs incurred in such removal upon establishing,* in a suit which may be brought against the United States Government in the United States Court of Claims, *that such discharge was caused solely by* (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) *an act or omission of a third party* without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes. [Emphasis supplied.]

The issue in this case is whether the oil discharge was caused *solely* by third parties, apparently engaged in an act of vandalism.

### Statement of Facts

The Nordstrom oil tank facility is located on the banks of Onancock Creek, a navigable waterway of the United States which empties into Chesapeake Bay. Nordstrom's compound is substantially surrounded by perimeter fencing. The only access to the non-fenced portion of the property is by water, or at water's edge through adjoining private property.

There are no security personnel on duty during non-business hours. The facility is used to store both gasoline and heating oil. The section containing gasoline tanks, called the BP plant, is further away from Onancock Creek than the heating oil tank area, called the Gulf plant. There were no night lights at the Gulf plant where oil is stored. Night lights are maintained at the BP (gasoline) plant, the office, and at the dock if a barge is moored there.

Large concrete retaining walls have been constructed around the Gulf and BP plants and there is also a retaining wall between the two plants. It was estimated that these concrete retaining walls had been built 30 years ago. They are 8 to 10 feet high and between 8 and 10 inches thick. When they are in good repair they embrace an area large enough and high enough to retain all the oil from a major tank failure within the Nordstrom facility and to keep any oil pooled within the retaining walls from spilling into Onancock Creek. Permanent metal ladders provide access over the retaining walls.

A Mr. Thomas Pittman, dispatcher at the Nordstrom oil tank facility, is responsible for opening up the facility and locking it at night. The only other persons with keys to the gate are truck drivers who may arrive for an early delivery. His normal working hours are 7:30 a.m. to 5 p.m. Monday through Friday. There are a total of ten employees at the facility.

On the morning of January 23, 1980, Mr. Pittman followed his usual routine, opening the gate to the BP (gasoline) plant and entering his office nearby. It was not his practice to go to the Gulf (heating oil) plant unless it was to be used that day. It is also his duty to open and shut the storage tanks to permit delivery to ships and trucks as required. At 5 p.m., it is his normal practice to close the valves on each tank at the Gulf plant, and to lock the gate, following which he does the same at the BP plant near his office before he leaves the facility for the day.

At about 8:00 a.m. on the morning of January 23, 1980, a Mr. Davis of Davis Oil Company entered Mr. Pittman's office holding a glass jar containing oil which he said was coming through the above-described retaining wall. Mr. Pittman went down to the Gulf plant, opened the gate, and examined the walls and tank No. 105. He was amazed to find a substantial amount of oil within the retaining walls and to see oil coming out through cracks in the walls. It appeared that the oil was emanating from tank No. 105. He ran back to the office and called Mr. Nordstrom, the Coast Guard, and the State Water Control Board. Cleanup operations were begun within an hour. The Coast Guard placed booms around the spill into Onancock Creek, and deployed a vacuum-type cleaner. Mr. Nordstrom retained Industrial Marine Services to clean

up the oil and the job was completed by January 29, 1980.

Tank No. 105 had been newly installed and was capable of holding 120,000 gallons. Records at the Nordstrom facility show it was holding 79,000 gallons of heating oil when the oil spill was discovered on January 23, 1980. About 15,000 gallons leaked through the retaining walls and into Onancock Creek.

Mr. Nordstrom, the President and part owner of plaintiff's insured, Nordstrom Oil Company, is in the business of selling home heating oil, as well as gasoline to service stations. He procures the gasoline and oil by barge from Norfolk, Virginia, and by truck from Salisbury, Maryland. His oil tank facility had been purchased from BP and Gulf. When he arrived at the scene about 10:30 a.m. on January 23, 1980, his first reaction was that his new tank, No. 105, had split. The tank had been constructed from 55 pieces of circular steel which had been welded together about 6 months earlier. When completed, it had been filled gradually in 25,000 gallon increments, to settle it on its sand and gravel base.

Because of his initial reaction that the tank had failed, Mr. Nordstrom went after the supplier. After many days of investigation by the latter's engineers, it was determined that nothing was wrong with the tank. The plaintiff insurance carrier conducted additional dye and bubble tests, with the same result. It was eventually concluded that there was nothing wrong and the tank has since been used without incident. The accident could not have resulted from leaving oil valves open since the tank is part of a closed system. If a valve were inadvertently left open, oil would flow into other tanks.

It was finally determined that the oil had emerged from a water drain valve located only 10 inches above the ground on the new tank. This is a valve used on rare occasions to drain any accumulated water from the bottom of the tank. It is not a valve ordinarily checked by Mr. Pittman because it is rarely opened. It was found to be open a

few turns after the 3-foot pool of oil behind the retaining wall was drained and the valve was revealed. The water drain valve is opened with a wheel-type handle, which was removed after this oil spill. It now can be opened only by use of a pipe wrench.

Since no Nordstrom Oil Company employee would have opened that valve and left it open, and since the oil spill occurred sometime between the close of business on January 22, 1980, after Mr. Pittman had checked the premises, locked up, and left, and 7:30 a.m. on January 23, 1980, when he returned to work, it is generally assumed that the valve was opened and left open by vandals. Nordstrom had experienced no incidents of vandalism prior thereto. This is a relatively rural area where vandalism is not commonplace. However, this incident occurred at a time when gasoline was high priced. A thief would not be able to tell which tanks contained gasoline and which contained heating oil, nor would an intruder know the purpose of the various valves.

A good deal of the trial was devoted to testimony and exhibits bearing on the condition of the retaining walls, because this oil spill would have been confined within those walls and would not have reached Onancock Creek had the walls been sound and impervious. Mr. Pittman acknowledged the presence of cracks, which he described as 6 feet long and thinner than a sheet of paper, on the opposite side from the water. He had tried to repair cracks pointed out to him by a representative of the Virginia State Water Control Board who had inspected the facility some 6 months earlier and during a follow-up visit some 3 weeks after the first inspection. He found the cracks so thin it was hard to insert caulking compound that would not dissolve when exposed to gasoline or oil.

Mr. Nordstrom testified that he had previously submitted a Spill Prevention Control and Countermeasure Plan mandated by the Environmental Protection Agency, and that it had been approved. The Plan contemplated and represented that the retaining walls would contain any single spill which might occur. He also testified that

he had always corrected any problems drawn to his attention by the Coast Guard and stated that he had never received a complaint regarding the retaining wall other than the one above mentioned from the Virginia Water Control Board.

Mr. Nordstrom had purchased the Gulf plant in 1972 or 1973 and estimated that the plant and its retaining walls had been built of heavy concrete about 1927. He had attempted to insert sheets of copper at stress points but the cracks were too fine. Concrete retaining walls are the most expensive structures authorized by the EPA to form a holding pond around an oil facility. Earth or block bulkheads are also permitted. Mr. Nordstrom testified that the retaining wall was 10 feet high near the water. He had contacted many suppliers, he said, in order to find a suitable material to repair cracks but had found no material which was gasoline and oil resistant. He had instead placed 15 tons of fill material against the wall.

A neighbor of the facility, Fred Wise, had observed oil coming through several cracks in the retaining wall at about 7:30 a.m. on January 23, 1980, and had documented what he saw with pictures which he thereafter supplied to the Coast Guard investigator. These were supplemented with additional photographs and were offered and received in evidence. Defendant presented other witnesses on the issue of notice to Nordstrom of the cracks in the retaining walls. Ms. Barbara Howe of the Virginia State Water Quality Control Board, accompanied by two Coast Guard Petty Officers, visited the facility on August 29, 1979, noted the cracks, and suggested to Mr. Pittman of the Nordstrom Oil Company that they be repaired. Following a second visit on September 1, 1979, she called Mr. Pittman on September 24, 1979, repeating her suggestion. Ms. Howe's inspections were performed as a courtesy, and she provided no written notices to Nordstrom. The evidence indicated that no significant amount of oil would have entered Onancock Creek had the retaining walls been intact.

*Discussion*

The Federal Water Pollution Control Act[2] declares it to be the policy of the United States "that there should be no discharges of oil * * * into or upon the navigable waters of the United States * * *."[3] It further provides that "(w)henever any oil * * * is discharged, into or upon the navigable waters of the United States * * * the President is authorized to act to remove or arrange for the removal of such oil * * * at any time, unless he determines such removal will be done properly by the owner * * * of the vessel, onshore facility, or offshore facility from which the discharge occurs."[4] Unless the owner of an onshore facility "can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party * * * such owner * * * shall be liable to the United States Government for the actual costs incurred * * * for the removal of such oil * * *."[5]

As indicated at the outset of this opinion, and to encourage the owners of facilities from which oil has been discharged to remove the oil on their own initiative, the same standards are applied to determine whether or not an owner who has initiated action to remove the oil shall recover on a claim for the removal costs which have been incurred.[6]

This court has succeeded to the jurisdiction of the United States Court of Claims. The predecessor court has analyzed claims of this type as requiring a showing that:

1. A discharge of a harmful quantity of oil from a facility owned or operated by the plaintiff has occurred;

---

2. Note 1, *supra*.

3. 33 U.S.C. § 1321(b)(1) (1976).

4. 33 U.S.C. § 1321(c)(1).

5. 33 U.S.C. § 1321(f)(2).

6. *See* text at note 1, *supra*.

2. The discharge was caused solely by (*inter alia*) an act or omission of a third party;

3. Removal of the oil was accomplished by plaintiff in accordance with the regulations; and

4. Plaintiff incurred costs to remove the oil.[7]

In this case, the sole issue revolves around Item 2, above, namely, whether or not the discharge was caused *solely* by an act or omission of a third party.[8] Resolution of that issue depends on the facts in each particular case. In *Chicago, Milwaukee, St. Paul and Pacific R.R. v. United States*,[9] burglars entered upon premises purchased by plaintiffs only 10 days earlier, and dismantled sections of pipe connected to an oil tank in order to steal the brass fittings, thereby causing an oil spill into navigable waters. The property was fenced and properly lighted. In that case the court, applying a standard of reasonable care to plaintiffs, held that the discharge was caused solely by the acts of a third person and that plaintiffs were entitled to recover their clean-up costs.

In contrast, see *Proctor Wholesale Co. v. United States*,[10] where a spill presumably caused by vandals occurred 40 days after plaintiff had acquired the property, where plaintiff did not even bother to learn what the tanks contained, and where there was no fence or lighting or security personnel to help prevent vandalism, nor any dike or berm to retain oil accidently discharged from a tank. On those facts the court found that it was "omissions of plaintiff

which gave the third party easy access to the tank area and created a situation conducive to vandalism." It was concluded that plaintiff had failed to establish that the discharge was caused "solely" by an act or omission of a third party within the meaning of the statute.[11]

■ As stated in *Union Petroleum Corp. v. United States*,[12] "(p)laintiff is not an insurer against criminal activity." Nevertheless, the court must focus on plaintiff's precautionary measures to prevent vandalism. The standard to be applied is one of "reasonable care".[13] In *Union,* following comprehensive trial, the facts were found to be closer to those in *Chicago, Milwaukee*[14] than to the facts present in *Proctor Wholesale*[15] or *City of Pawtucket*.[16] Plaintiff's property in *Union* was fully fenced, well lighted, and guarded by security personnel. No evidence detracted from the adequacy or reliability of plaintiff's containment facilities should a mishap nevertheless occur. The United States Coast Guard testified that *Union* had used reasonable care, and that the spill was unforeseeable.

■ The present case is in stark contrast. Fencing around the facility was not complete. There were no security personnel on duty during non-business hours. Permanent ladders on the retaining walls provided access over those walls. There was no lighting in the area where the oil spill originated. Prior to the spill, a wheel-type handle left on the water drain valve made it easy to open that valve.

Last but not least, the retaining walls would have provided a "last clear chance"

---

7. *Quarles Petroleum Co. v. United States,* 213 Ct.Cl. 15, 19, 551 F.2d 1201, 1204 (1977), citing *Yankee Metal Products, Inc. v. United States,* 209 Ct.Cl. 770, 538 F.2d 347 (1976).

8. *See* and *cf. Union Petroleum Corp. v. United States,* 218 Ct.Cl. 667 (1978).

9. 216 Ct.Cl. 155, 575 F.2d 839 (1978).

10. 215 Ct.Cl. 1049, 578 F.2d 1388 (1978).

11. To the same effect, see *City of Pawtucket v. United States,* 211 Ct.Cl. 324, 546 F.2d 430 (1976), where the city took possession of property 8 months before the spill and took no

action to repair perimeter fencing, nor to restore lighting which had burned out, nor to repair drainage facilities designed to protect against accidental spillage, nor to lock the gate nor the spigots on the oil tanks.

12. 228 Ct.Cl. 54, 651 F.2d 734 (1981).

13. 228 Ct.Cl. at 73, 651 F.2d at 745.

14. Note 9, *supra.*

15. Note 10, *supra.*

16. Note 11, *supra.*

to avoid a statutory violation had they not been in disrepair. Even assuming *arguendo* that plaintiff's insured is to be held to a somewhat lesser standard of reasonable care than would be the owner of an urban facility, because vandalism was not anticipated in this relatively rural area, that is no excuse for permitting the retaining walls to remain unrepaired. They were the last line of defense against *all* spills, including those unrelated to acts of third parties, such as a tank rupture which was first thought to be the cause of this spill. Nordstrom had been warned of the cracks in its retaining walls on more than one occasion. The suggestion that it was impractical or impossible to repair those cracks strains credulity.[17]

Plaintiff also cites Coast Guard inspections which turned up no deficiencies. The answer to this is that Nordstrom had both actual and constructive notice of cracks in its retaining walls which rendered them vulnerable to an oil spill. Moreover, the Coast Guard inspections were primarily directed to the transfer facilities for movement of oil to and from vessels moored at the dock, and not with Nordstrom's onshore containment structures.

### Conclusion

The evidence shows that this oil spill was not caused "solely" by an act or omission of a third party and that plaintiff is therefore not entitled to recover its costs of removal. Accordingly, the petition shall be Dismissed.

---

**17.** *See* and *compare Atlantic Richfield Co. v. United States,* 1 Cl.Ct. 261 (1982) (KOZINSKI, C.J.).