**A/S D/S SVENDBORG & D/S AF 1912 A/S, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**UNITED STATES of America, Plaintiff,**

**v.**

**A.P. MOLLER, Moller Steamship Company, Inc., A/S D/S Svendborg & D/S AF 1912 A/S and the West England Ship Owners Mutual Protection & Indemnity Association (Luxembourg), Defendants.**

**Nos. 85 Civ. 4930 (JMW), 85 Civ. 7858 (JMW).**

United States District Court, S.D. New York.

Oct. 15, 1986.

Robert L. Mahar, of Freehill, Hogan & Mahar, New York City, for plaintiffs.

Lawrence Brennan, Thomas Murphy, Jr., U.S. Atty's. Office, New York City, for defendants.

## OPINION

WALKER, District Judge:

### INTRODUCTION

The instant case arises out of a June 28, 1983 incident where the vessel Peter Maersk discharged about 1,000 barrels of oil into the Cape Fear River of North Carolina. Plaintiffs Svendborg, et. al. ("Svendborg") move for summary judgment, seeking to recover from Defendant United States of America ("the government") $58,969.40 in clean-up and repair costs related to the spill. Plaintiffs seek recovery pursuant to the Federal Water Pollution Control Act, which authorizes government payment of such costs where an accident causing injury to a shipowner results from a cause other than the shipowner's negligence. 33 U.S.C. § 1321, *et. seq.*

For the reasons set forth below, plaintiffs' motion is granted.

### STATEMENT OF FACTS

At about 11:30 p.m. on June 28, 1983, the vessel Peter Maersk was proceeding upstream in calm weather on the Cape Fear River, approximately 15 miles from the Atlantic Ocean. The middle of the upper Lilliput Range of the river, where the vessel was traveling, typically would possess a depth of at least 40 feet during the flood tide which occurred during the vessel's passage. The draft of the Peter Maersk was no more than 37 feet, one inch.

Suddenly, the vessel struck a submerged cement object, not reported on the depth chart for the Cape Fear River prepared by the Army Corps of Engineers, an agency of the United States Government. A subsequent investigation revealed that the object had punctured a hole in the vessel's hull, allowing river to flood the vessel and oil from two tanks to escape into the river. A few minutes later, the sinking vessel came to rest on the channel floor of the Cape Fear River, composed of sand and mud.

The following evidence supports this description of the events which resulted in the June 28 oil spill on the Cape Fear River. Jorgen Thau, the vessel master, stated in an affidavit that the vessel was proceeding in the center of the river channel when he "noticed the vessel's foremast move slightly as if the vessel had struck something." Shortly thereafter, the vessel grounded on the river channel floor and a crew member discovered the hole resulting in the oil spill. Thau further swears that the draft of the vessel was no greater than 37 feet, one inch, and that the depth of that part of the Cape Fear River where the vessel was proceeding was about 40 feet during the flood tide in progress when the collision occurred,

An affidavit filed by Esso Clemmons, a Cape Fear State River Pilot who was guiding the Peter Maersk at the time of its collision with the submerged object, corroborates many of the specific facts stated in Thau's affidavit. Clemmons, like Thau, states that the draft of the Peter Maersk was no more than 37 feet, one inch, and the center channel of the Cape Fear River where the collision occurred typically would be at least 40 feet deep during a flood tide. Clemmons' affidavit describes the collision as follows: "[T]he ship was on the center line of the channel and the bow touched an unknown object on the bottom."

A brief Coast Guard report filed shortly after the collision reported the presence of "a 6 to 8 ft. lump in channel" at the site of the collision. The report suggested that authorities place warning markers around the object and alert vessel pilots of its presence.

The accounts of Thau and Clemmons receive further support in a more detailed Coast Guard report, dated November 1, 1983. The Coast Guard report verifies the

draft and depth measurements appearing in the Thau and Clemmons affidavits, stating that prior to the collision "approximately 3 feet 8 inches of water was under the vessel." The report states the oil spill occured after "there was impact from a submerged object on the vessel's port side underwater hull ... of sufficient force to puncture the vessel's bottom plate...." The report described the submerged object as "sharp and hard," and indicated that the vessel's contact with the object "was sudden and without warning...." The report thus found that "[t]here is no actionable misconduct, inattention to duty, or negligent or willful violation of law or regulation on the part of licensed or certificated persons...."

In addition, plaintiffs received a report prepared by National Testing Laboratories, Inc., a metallurgy-testing facility. The report examined rock fragments removed from the hole through which the oil escaped from the Peter Maersk into the Cape Fear River, concluding that these fragments were composed of cement, a compound not typically found on the floor of the Cape Fear River.

Defendant presents no eyewitness accounts or empirical evidence inconsistent with the account described above. Defendant's single affidavit, signed by Lawrence B. Brennan, an attorney for defendant, presents only speculations as to possible alternate scenarios under which negligence on the part of the crew or owners of the Peter Maersk resulted in the spill.

Plaintiffs filed a complaint in the instant action with this Court on June 26, 1985. The government filed a related action seeking recovery from various third-party defendants, which this Court consolidated with plaintiffs' earlier action on February 4, 1986.

## DISCUSSION

The government opposes plaintiffs' motion for summary judgment on two grounds. First, the government asserts that this Court lacks jurisdiction to hear plaintiffs' Federal Water Pollution Control Act claim. Second, the government contends that unresolved issues of material fact require a trial on the merits of this claim. The Court finds both of the government's arguments unpersuasive.

### Jurisdiction

Plaintiffs seek to invoke this Court's pendent jurisdiction in arguing their claim, under the Federal Water Pollution Control Act, for the cost of removing oil from the Cape Fear River. Where the only substantive issues in a controversy arise out of the Water Pollution Control Act, a plaintiff must bring any suit against the United States Government in the United States Court of Claims. 33 U.S.C. § 1321(i)(1). However, in addition to plaintiffs' action for the cost of removing the spilled oil, plaintiffs also seek recovery for damage to the hull of the vessel Peter Maersk, alleging a negligence action, which plaintiffs must bring in federal district court under the Suits in Admiralty Act, 46 U.S.C. § 742. Plaintiffs seek to argue their Water Pollution Control Act claim together with their negligence claim by invoking this Court's pendent jurisdiction.

Only a single federal case has considered whether a federal court should exercise pendent jurisdiction to hear claims brought under the Water Pollution Control Act. In *Gulf Refining Company v. United States,* 69 F.R.D. 300 (E.D.Tex.1976), a district court held that a plaintiff could not argue claims arising under the Water Pollution Control Act in a case before that court under its admiralty jurisdiction. The decision in *Gulf Refining* relied almost entirely on the statutory language providing the Court of Claims with jurisdiction over claims arising under the Water Pollution Control Act. *Id.* at 302–03. This Court declines to follow the decision in *Gulf Refining,* and accordingly will hear plaintiffs' Water Pollution Control Act claims under its pendent jurisdiction.

"The test for determining whether a court having jurisdiction over a federal claim may properly assume jurisdiction over a pendent ... claim is whether the

claims derive from a common nucleus of operative fact." *Rosario v. Almalgamated Ladies' Garment Cutters' Union*, 605 F.2d 1228, 1247 (2d Cir.1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980). "Application of the doctrine of pendent jurisdiction is discretionary; it requires a balancing of the considerations of comity, fairness to the litigants [and] judicial economy...." *Federman v. Empire Fire & Marine Insurance Co.*, 597 F.2d 798, 809 (2d Cir.1979). However, a court should not decline to exercise pendent jurisdiction where a second cause of action involves essentially the same factual issues as the claim already before the court. "The federal judiciary has an obvious interest in every litigation in having the whole case tried at one time.... The unified federal courts certainly have a stake in discouraging duplicative litigation not only within a single district but within the entire system." *Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 720 (2d Cir.1980).

■ In this case, plaintiffs' negligence action, before this Court under the Suits in Admiralty Act, and plaintiffs' action under the Water Pollution Control Act, over which this Court asserts pendent jurisdiction, involve precisely the same issues of fact. Both actions arise out of the same incident: the grounding of and discharge from the vessel Peter Maersk on the Cape Fear River. Further, plaintiffs may base both actions on similar allegations of negligence against the government. Plaintiffs' negligence action, brought under the Suits in Admiralty Act alleges "wrongdoing, negligence and lack of care of the Defendant...." Similarly, a plaintiff may recover costs resulting from its discharge into a waterway under the Water Pollution Control Act if that plaintiff proves "negligence

on the part of the United States." 33 U.S.C. § 1321(i)(1)(C).[1]

The fact that plaintiffs' Water Pollution Control Act claim sounds in federal rather than state law also supports the exercise of pendent jurisdiction in the instant case. "Consolidating claims within the court's subject matter jurisdiction with claims arising under federal law but not satisfying jurisdictional statutes enhances efficiency without risking a misreading of state law or trenching upon state sovereignty." *Lieb v. American Motors Corp.*, 538 F.Supp. 127, 139 (S.D.N.Y.1982); *accord Naylor v. Case & McGrath, Inc.*, 585 F.2d 557, 562 (2d Cir.1978) (noting importance of "concerns of comity and federalism" where federal court exercises pendent jurisdiction over state claim).

Notwithstanding the practical advantages of exercising pendent jurisdiction in any particular case, a court cannot hear a claim which Congress has reserved for exclusive resolution in another forum. *Aldinger v. Howard*, 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976); *Tri-Ex Enterprises, Inc. v. Morgan Guaranty Trust Co.*, 596 F.Supp. 1, 5 (S.D.N.Y.1982). The court in *Gulf Refining Co. v. United States*, 69 F.R.D. 300 (E.D.Tex.1976), declined pendent jurisdiction over a Water Pollution Control Act claim, based upon such a reading of the statute.

However, no language in the Water Pollution Control Act explicitly proscribes a district court from exercising pendent jurisdiction. A "court should look for some evidence that Congress intended to force plaintiffs to bifurcate litigation arising out of a single core of operative fact before it finds implicit negation of pendent party jurisdiction." *Bolton v. Gramlich*, 540 F.Supp. 822, 846 (S.D.N.Y.1982).[2] Discern-

---

1. Under this section, a plaintiff may also recover from the government if discharge resulted from "an act of God, ... an act or war, ... [or] an act or omission of a third party without regard to whether such act or omission was or was not negligent" or of some combination of these causes together with or apart from an act of government negligence.

2. The Court of Claims must order payment of a plaintiff's claim under the Federal Water Pollution Control Act from a special government fund. 33 U.S.C. § 1321(i)(3). However, the necessity of a Court of Claims order should not preclude a district court's exercise of jurisdiction under the act, since nothing prevents a party from enforcing a district court's judgment in the Court of Claims. *See Gunston v. United*

ing no evidence of such intent in the Water Pollution Control Act or its legislative history,[3] this Court does not find that Congress wished to proscribe any district court from exercising pendent jurisdiction where claims under this act are related closely to other claims before the court. *See Woodland Nursing Home Corp. v. Califano,* 487 F.Supp. 9 (S.D.N.Y.1979). (Court of Claims subject matter jurisdiction over medicare reimbursement claims brought pursuant to 42 U.S.C. § 1395 does not proscribe all district court exercise of pendent jurisdiction under this section).

Accordingly, this Court will consider plaintiffs' claim pursuant to the Federal Water Pollution Control Act under an exercise of pendent jurisdiction.

*Absence of Factual Controversy Precluding Summary Judgment*

Having accepted jurisdiction over plaintiffs' Water Pollution Control Act claim, this Court now considers plaintiffs' motion for summary judgment, seeking government reimbursement for the $58,969.40 costs of removing oil from the Cape Fear River. A court must render summary judgment where "there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). "Ambiguities or inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the summary judgment motion.... However, mere allegations in the non-moving party's pleadings are insufficient to show that there is a triable issue of fact if the moving party has made the necessary Rule 56(c) showing." *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983).

Under the Federal Water Pollution Control Act, a plaintiff may receive government reimbursement for the costs of removing a hazardous discharge from United States waters upon proving "that reasonable actions had been taken [by plaintiff] to prevent or forestall such intervention by the third party." *Chicago, Milwaukee, St. Paul and Pacific Railroad Company v. United States,* 575 F.2d 839, 841, 216 Ct.Cl. 155 (1978). In support of their summary judgment motion, plaintiffs have attempted to show the reasonableness of their conduct by producing affidavits from the master of the vessel Peter Maersk, Jorgen Thau, and the state river pilot who was navigating the vessel when the oil spill occurred, Esso Clemmons. More significantly, plaintiffs have produced a Coast Guard report, dated November 1, 1983, which concludes that "[t]here is no evidence of actionable misconduct, inattention to duty, or negligent or willful violation of law or regulation on the part of licensed or certified persons...."

"As a general proposition, administrative records may be a sufficient basis for the granting of a motion for summary judgment." *United States v. Pent-R-Books,* 538 F.2d 519, 527 (2d Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977). Moreover, in cases arising under the Water Pollution Control Act, the findings of the Coast Guard represent unusually significant evidence. Congress has charged the Coast Guard with primary responsibility for implementating many provisions of this act, and has authorized the Coast Guard to assess civil penalties against a culpable vessel owner of as much as $5,000. 33 U.S.C. § 1321(b)(6). Accordingly, where the Coast Guard has investigated an incident involving discharge of a hazardous substance, "great weight must be accorded to its determination." *Commonwealth of Puerto Rico v. SS Zoe Colocotroni,* 456 F.Supp. 1327, 1350 (D.P.R.1978), *aff'd in part, vacated in part,* 628 F.2d 652 (1st Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981).

The government has failed to produce any statement from J.Z. Carter, author of the Coast Guard report, modifying the re-

*States,* 602 F.2d 316, 221 Ct.Cl. 57 (1979); *Benjamin v. United States,* 348 F.2d 502, 510 n. 4, 172 Ct.Cl. 118 (1965).

3. This Court has found no evidence in the legislative history of the Federal Water Pollution Control Act that Congress intended to preclude a district court from hearing claims pursuant to its pendent jurisdiction.

port's broad finding that the accident did not result from any negligent conduct on the part of the operators of the Peter Maersk. Instead, the government attacks the report as inadmissable evidence, citing *Stissi v. Interstate & Ocean Transport Co.*, 765 F.2d 370 (2d Cir.1985).

*Stissi,* however, establishes no rule that a Coast Guard report, such as that presented in the instant case, is inadmissable. The Court of Appeals addressed the admissability of the Coast Guard report at issue in *Stissi* in a single sentence: "[T]he district court did not abuse its discretion in redacting the double hearsay and conclusory portions of the Coast Guard report." *Id.* at 376. This holding that a district court may refuse to admit a *portion* of a Coast Guard report does not support the government's argument that a court cannot consider such a report as evidence.

The Federal Rules of Evidence explicitly allow introduction of "[r]ecords, reports, statements, or data compilations in any form, of public offices or agencies." Fed. R.Evid. 803(8). A district court exercises "broad discretion" in determining when such a document "has sufficient indicia of reliability to justify its admission." *City of New York v. Pullman, Inc.*, 662 F.2d 910, 911 (2d Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). The carefully worded, 5–page report offered in the instant case represents highly reliable and relevant evidence, and thus plaintiffs may use this report in support of their motion for summary judgment. *See Smith v. Ithaca Corp.*, 612 F.2d 215, 222 (5th Cir.1980) ("Because of the experience and expertise of the Coast Guard in investigating marine disasters, the timeliness of the investigation in this case, and the impartiality of the Coast Guard, we find the Coast Guard report sufficiently trustworthy to justify the district court's admission of the report's findings of fact.")

The government's other attempts to present unresolved issues of material fact merit little discussion. The government speculates that the Peter Maersk was negligently steered near the left bank of the Cape Fear River, where the ship grounded in shallow water. Yet the government offers no evidence supporting this interpretation of the incident. "[C]onclusory allegations of the mere possibility that a factual controversy may exist is not enough to avoid summary judgment." *Fraser v. Doubleday & Co.,* 587 F.Supp. 1284, 1287 (S.D.N.Y.1984). Further, the government's suggestion that the hole through which oil escaped from the Peter Maersk was caused by the grounding of the ship on the sandy bottom of the Cape Fear River is inconsistent with the report of National Testing Laboratories, which stated that fragments of material embedded in this hole were composed of concrete. The government makes no attempt to explain this inconsistency.

The government also argues that the presence of the words "as if" in the affidavit statement of vessel master Thau: "I noticed the vessel's foremast move slightly as if the vessel had struck something" indicate Thau's belief that some cause other than a collision with a submerged object created the hole in the Peter Maersk which resulted in the oil spill. A more strained reading of plain language is difficult to imagine.

## CONCLUSION

Plaintiffs' motion for summary judgment under the Water Pollution Control Act is granted.

SO ORDERED.