CHICAGO, MILWAUKEE, ST. PAUL
AND PACIFIC RAILROAD COMPANY
and Milwaukee Land Company

v.

The UNITED STATES.

No. 269-76.

United States Court of Claims.

April 19, 1978.

Robin Thomas Baker, Seattle, Wash., for plaintiffs. J. Fred Simpson, James E. Nelson, and Dennis G. Opacki, Seattle, Wash., of counsel.

Joan M. Cloonan, Washington, D. C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D. C., for defendant. Angus MacBeth, New York City, of counsel.

Before NICHOLS, KASHIWA and KUNZIG, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge.

This is an oil spill recovery case in which plaintiffs seek reimbursement in the amount of $11,058.58 [1] for costs they incurred in clean-up and removal of oil discharged into navigable waters of the United States. Plaintiffs, owners of the abandoned meat packing plant where the spill originated, assert that the spill was caused solely by the act of a third party and claim entitlement to recovery under Section 311(i)(1) of the Federal Water Pollution Control Act, 33 U.S.C. § 1321(i)(1) (Supp. V, 1975).[2] We agree with the plaintiffs and find that they are entitled to recover.

Plaintiffs, the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (Milwaukee Road) and its wholly owned subsidiary, the Milwaukee Land Company (Milwaukee Land) are corporations doing business in the State of Washington. In 1974, plaintiffs were acquiring property in connection with their plan to build a railroad switching yard; pursuant to this plan, plaintiffs purchased an abandoned meat packing plant, formerly operated by the Valley Packing Company, situated at 3602–70th Avenue East, Pierce County, near the City of Fife, Washington. Plaintiffs purchased this property (the non-operating meat packing plant) on December 31, 1974, as part of a 180-acre assemblage for their proposed railyard facility. It was plaintiffs' intent to raze the meat packing plant, and they did, in fact, raze the entire facility in May, 1975.

The meat packing plant had an oil-fired furnace and two oil tanks to feed it, a "main storage" tank of approximately 7,000 to 8,000 gallons capacity and a "boiler room" tank of approximately 500 gallons capacity. There was an estimated residue of some 1,500 gallons of fuel oil in the tanks on December 31, the date of purchase, and this oil was subsequently discharged ten days later, on January 10, 1975, by the actions of two criminals who dismantled sections of pipe leading from the storage tanks in order to steal certain brass fittings.[3] Though the greater portion of the discharged oil was retained in a "fair-sized" pothole near the premises, some of it reached Wapato Creek and flowed into navigable waters of the United States. Upon notification of the spill, plaintiffs undertook a full clean-up and incurred the oil removal costs which are the subject of this suit.

Defendant maintains that plaintiffs are not entitled to recover their clean-up costs. Defendant points to language in the statute which requires, as a precondition to reimbursement, that the spill be caused "solely" by the action of a third person. Defendant takes the position that plaintiffs' actions or inactions, insofar as they failed to prohibit or deter the criminals from burglarizing the

---

1. In their petition, plaintiffs claimed $10,908.56. This sum apparently did not include a later-received bill for the costs of cleaning some forty ducks (all of which survived). Plaintiffs subsequently increased their claim to $11,058.58, and defendant does not take issue with this new figure, adjusted to include the duck bill.

2. § 1321 Oil and hazardous substance liability.

   \* \* \* \* \* \*

   (i) Recovery of removal costs.
   (1) In any case where an owner or operator of a vessel or an onshore facility or an offshore facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section acts to remove such oil or substance in accordance with regulations promulgated pursuant to this section, such owner or operator shall be entitled to recover the reasonable costs in-

curred in such removal upon establishing, in a suit which may be brought against the United States Government in the United States Court of Claims, that such discharge was caused *solely by* (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) *an act or omission of a third party* without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes. (emphasis added)

3. One Frank Leo Sidorski, Jr., has pled guilty, before a judge of the Pierce County Superior Court, to a charge of second degree burglary in connection with the theft of the brass valves. A suspected accomplice in the burglary remains at large though an arrest warrant has been issued.

plant, disassembling the pipes, and releasing the oil, were partially responsible for the spill—hence, the spill was not *soley* caused by the third parties.

Plaintiffs argue to the contrary. Plaintiffs urge that this oil spill was caused by the actions of criminal intruders and that plaintiffs are innocent victims of those acts. Plaintiffs assert that they or the preceding owners took all reasonable steps to protect their property and that the statute does not require more than this.[4] The oil spill, plaintiffs conclude, was caused solely by the acts of a third person within the meaning of the statute.

■ We agree with plaintiffs. The critical issue in this case is whether the discharge was caused solely by the third party's act or whether the plaintiffs were partially responsible. This court has made it clear that a claimant cannot recover, even if a vandal or third party immediately caused the spillage, if the claimant does not prove that reasonable actions had been taken to prevent or forestall such intervention by the third party. *Proctor Wholesale Co., Inc. v. United States*, Ct.Cl. No. 398–76 (Order of Feb. 3, 1978); *City of Pawtucket v. United States*, 211 Ct.Cl. 324 (1976). Thus our focus in a case such as this must be upon plaintiffs' conduct and the standard against which we measure that conduct is "reasonable care." We find, on the particular facts here before us, that plaintiffs in the instant case did exercise the required level of reasonable care, that the act of the criminal intruders was the sole cause of the spill within the meaning of the statute, and that plaintiffs are entitled to recover.

Our prior cases have given substance to the reasonable care standard we use to determine whether a given spill was "solely" the act of a third party or whether the claimant was partially responsible. In *Pawtucket, supra*, we noted that there were gaping holes in the protective fence, no lighting in the tank area, no locks, unprotected oil tank spigots, and improper drainage spouts for possible overflow oil—all of these conditions remaining some eight months after the new owner (City of Pawtucket) took possession. In *Proctor, supra*, we found that there was no fence, no external lighting, and, in short, no protective measures whatsoever to guard against vandalism—some forty days after the new owner (Proctor Wholesale Company) took possession. In both of those cases, we found that it "was the omissions of plaintiff [the new owner] which gave the third party easy access to the tank area and created a situation conducive to vandalism."

■ We have then, in making our determination of whether the owner exercised reasonable care in similar cases, weighed such factors as the presence or absence of fences, lights, locks, and other protective measures—given the amount of time available to the new owner to take appropriate actions. Those cases suggest an approach where the extent of care required is measured both by the condition in which the new owner finds the property and by the length of time the new owner has held it. It is in this light that we now turn our attention to the particular facts surrounding the oil spill in the instant case.

As previously noted, plaintiffs purchased this abandoned meat packing plant with the intention of razing it. The property is situated in a suburban commercial area near Fife, Washington, some ten miles outside of Tacoma. During the ten days after it purchased the facility, plaintiff Milwaukee Land began an inspection of the property. Had the inspection been completed prior to the spill (which occurred on the tenth day) it would have revealed the following: There was a boiler room in a separate small shed behind the main building. In the boiler room, behind a barred door, was an oil-fired furnace and a partially buried 500 gallon supply tank. This "boiler room" tank was connected to an outdoor 7–8,000

---

4. In *Proctor Wholesale Co., Inc. v. United States*, Ct.Cl. No. 398–76 (Order of Feb. 3, 1978), and *City of Pawtucket v. United States*, 211 Ct.Cl. 324 (1976), we attributed to plaintiffs constructive knowledge of the condition of the premises as conveyed by the previous owners. Fairness requires that we attribute this same constructive knowledge to plaintiffs here.

gallon "main storage" tank. The flow of oil from the main storage tank to the boiler room tank was controlled by two inline brass valves on the feeder pipe which connected the two tanks. Both valves were closed, and *each valve handle had been protectively removed* before the burglary occurred. The flow of oil from the boiler room tank to the furnace was likewise controlled by a valve which was closed. The entire assemblage was protected against accidental overflow by a capped vent pipe leading from the boiler room tank. In addition to the barred door and removed handles, inspection in those first ten days would have revealed that there was a perimeter fence around the facility and that there was outside lighting.

The two burglars who entered the facility on January 10 apparently passed through the gate and then broke into the barred and locked boiler room. Using the tools they had brought, they proceeded to disassemble sections of pipe leading from the boiler room tank in order to remove certain brass fittings which they wanted for salvage value. They similarly vandalized the main storage tank outside the boiler room. The burglars removed the cap from the boiler room tank vent pipe (which protected against overflow) and, in their attempt to remove the inline brass valves on the pipe which connected the tanks, opened the valves and left them open. The oil then flowed from the main tank to the boiler room tank through valves opened by the

vandals, overflowed the boiler room tank through the overflow vent cap removed by the vandals, seeped through the floor of the boiler room, and found its way into Wapato Creek.

The circumstances here clearly distinguish this case from those in which we held the owner to have "created a situation conducive to vandalism." In *Pawtucket, supra,* the City had held the property in a state of disrepair for *eight months.* In *Proctor, supra,* the new owner had held the property in a totally unprotected condition for some *forty days.* Our task is one of line-drawing and though, admittedly, it is often difficult to do so, we find that the instant case is on the other side of the line from *Proctor, supra.* There the property was held 40 days, here, ten;[5] there the facility was without fences, outside lights, or other indicia of care, here there was a fence, lights, and a barred door discouraging access to the boiler room and also, here, the feeder pipe valves were closed and the handles removed and the vent pipe capped. We simply cannot say that plaintiffs here, given only ten days' ownership, did not exercise reasonable care to forestall third party intervention. We conclude, instead, that reasonable care was taken in the circumstances of this case.[6]

One last argument raised by defendant is deserving of brief mention. Defendant claims that 40 C.F.R., part 112 establishes a standard of care, violation of which, without more, should bar a claimant from recov-

5. Both parties have insisted that this is a "ten day case." At oral argument, counsel for defendant repeatedly stated that the time before the new owner closed the deal was not significant. This court agrees with the parties and treats this as a ten day case.

6. Many of our prior oil spill cases did not reach the question of reasonable care. *E. g., Shell Oil Company v. United States,* 209 Ct.Cl. 699 (1976) (spill did not come from claimant's "onshore facility"); *Celestial Navigation Corp. v. United States,* 209 Ct.Cl. 721 (1976) (oil not discharged from claimant's vessel); *Yankee Metal Products, Inc. v. United States,* 209 Ct.Cl. 770 (1976) (claimant did not allege that it owned the facility); *Tanker Hygrade No. 18, Inc. v. United States,* 526 F.2d 805, 208 Ct.Cl. 488 (1975), *cert. denied,* 426 U.S. 920, 96 S.Ct.

2624, 49 L.Ed.2d 373 (1976) (wholly owned subsidiary not a "third party").

Among those cases which did reach the question of reasonable care, *Pawtucket* and *Proctor* have been discussed already. In *Quarles Petroleum Co., Inc. v. United States,* 213 Ct.Cl. 15, 551 F.2d 1201 (1977), we were primarily concerned with a question of subrogation and held, without extensive analysis, that reasonable care had been exercised. In *General Motors Corp. v. United States,* 213 Ct.Cl. 703 (1977), we held that claimant had exercised reasonable care, basing the decision on the doctrine of collateral estoppel. In *Refiners Transport and Terminal, Inc. v. United States,* Ct.Cl. No. 416–72 (Order of Nov. 23, 1973), judgment was entered on a stipulation that the spill was caused solely by the acts of a third party.

ering clean-up costs. Asserting that the "key substantive provision" of part 112 is the requirement that each property owner to whom the regulations apply prepare a Spill Control and Countermeasure Plan (SPCC Plan), defendant points out that plaintiffs here did not prepare such a plan within ten days and should, therefore, be barred from recovery. We disagree.

We reject at the outset defendant's contention that the tort law of the State of Washington (which, defendant asserts, holds that violation of a duty prescribed by statute is negligence *per se*) has any relevance whatsoever to our analysis. It is a federal statute we are construing.[7]

In interpreting this federal statute, we decline to accept defendant's invitation that we apply the rule of "negligence *per se*" to the SPCC preparation requirement embodied in 40 C.F.R. § 112.3. The principal object of part 112 is not to generate paperwork, but to *help prevent oil spills* by suggesting various sound and reasonable practices which could be adopted into a plan. The regulations, 40 C.F.R. § 112.-7(e)(9)(i)–(v), recommend various measures to help insure the security of oil storage facilities, including fences, gates, lighting, locks or guards, and the securing of valves—factors substantially similar to those we have already considered in determining that reasonable care has been exercised in this case. The additional act of preparing the SPCC Plan, per 40 C.F.R. § 112.3, is not, and could not be, itself a primary standard of conduct. Instead we treat the preparation of an SPCC Plan as only one of the many indicia to be considered in determining the overall reasonableness of a claimant's conduct. We find,

in light of the limited ten day period of ownership and the other circumstances of this case, that this factor is not enough to convince us that plaintiffs failed to exercise reasonable care. Thus, defendant's final argument fails.

In summary, we have found that plaintiffs in the instant case did exercise the required level of reasonable care during the ten days they held the property prior to the spill, and that the act of criminal intruders caused the spill. We hold that the discharge was caused solely by the acts of a third person within the meaning of the statute and that plaintiffs are entitled to recover their clean-up costs.

Accordingly, upon consideration of the briefs and exhibits, and after oral argument, defendant's motion for summary judgment is denied and plaintiffs' cross-motion for summary judgment is granted. Judgment is hereby entered for plaintiffs in the amount of $11,058.58.

---

7. "A federal court sitting in a non-diversity case such as this [involving an accommodation maker of a note subsequently assigned to a federal agency] does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. . . . [Federal law] is found in the federal Constitution, statutes, or common law." *D'Oench, Duhme & Co., Inc. v. Federal Deposit Insur-*ance Corp., 315 U.S. 447, 471–72, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (Jackson, J., concurring).

See also *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (federal common law controls in an action to abate pollution of interstate or navigable waters); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (federal common law controls rights and duties on check issued by the United States).